# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION AT DAYTON

PHILLIP H. LAWRENCE,    :

   Petitioner,    :   Case No.  3:04CV074

 vs.         :   District Judge Walter Herbert Rice
             Magistrate Judge Sharon L. Ovington

PAT HURLEY, Warden,    :
Ross Correctional Institution,
          :
   Respondent.

## REPORT AND RECOMMENDATIONS[1]

## I.  INTRODUCTION

On October 24, 2000, Antonne Pollard was fatally shot in his chest.  Before Pollard died, he identified his assailant to bystanders and police only by the initials "P.J."  (Doc. #6, Exhibit 15).

A jury in the Montgomery County, Ohio Court of Common Pleas found Phillip H. Lawrence guilty of Antonne Pollard's murder (with a firearm specification) and guilty of murder as a result of felonious assault.  (Doc. #6, Exhs. 1, 7).  The trial court merged the murder convictions as warranted under Ohio law and sentenced Lawrence to a term of imprisonment lasting fifteen years to life.  *Id*.

Lawrence unsuccessfully sought relief from his convictions in the Ohio Court of Appeals and the Ohio Supreme Court.  (Doc. #6, Exhs. 11-18).

---

[1] Attached hereto is a NOTICE to the parties regarding objections to this Report and Recommendations.

Lawrence brings the present case *pro se* seeking a Writ of Habeas Corpus pursuant to 28 U.S.C. §2254.  This case is before the Court upon Lawrence's Petition (Doc. #1), Respondent's Answer/Return of Writ (Doc. #6), Lawrence's Traverse Brief (Doc. #8), and the record as a whole.

## II.    BACKGROUND

The Ohio Court of Appeals described the factual background of Lawrence's case as follows:

> On the morning of October 24, 2000, some time before 8:00 a.m., Taquita Young opened the back door of her house, heard gunshots, and saw a man running around the corner of her house with his right arm extended.  Young did not see the man's face, but nevertheless recognized him as Lawrence, known to her as 'P.J.,' who lived directly across from her in the next house.  In addition to recognizing Lawrence's physical characteristics, Young noted that he was wearing a black jogging suit that she often saw Lawrence wearing.

> Almost simultaneously, Young heard a knocking at her front door, cries for help, and more gunshots.  Young went to her front window, and looked through the blinds.  She saw Antonne Pollard, known to her as 'Tonne,' in the grassy area between her building and the next building.  Tonne quickly disappeared from her view.

> Meanwhile, Christopher Lacy was asleep in his bedroom when he also heard gunshots.  He then heard a male voice screaming, 'help,' 'help,' 'help,' at his back door.  As Lacy approached the back door, it flew open, and Pollard, whom Lacy had never seen before, was standing outside.  Lacy saw that Pollard had been shot in the chest, and directed him to the living room couch.

> Lacy left Pollard in the house, and went two doors down to his aunt, Milan Jackson.  Jackson had already called 9-1-1, because she, also, had heard gunshots and cries for help.  Jackson went with Lacy back to Lacy's house, to check on Pollard.  Young also arrived at the house, upon learning that Pollard had been shot.  Lacy asked Pollard, 'Who shot you?'  Pollard replied, 'P.J.'

> Young returned to her house.  As she did so, she saw Lawrence, walking in her direction, and made eye contact.  Lawrence had a gun in his hand.  Lawrence was 'just lookin′ at me with the looks to kill as if – if I say somethin′

2

I'll be next.'  Young recognized Lawrence, and confirmed her recognition of
Lawrence as having been the person she saw earlier, running around the corner of
her house.

Meanwhile, Pollard told a responding police officer that he had been shot.
In response to the officer's question, Pollard identified the person who shot him
as 'P.J.'  When the officer asked Pollard, 'do you know his real name besides
P.J.?'  Antonne shook his head 'no.'

Pollard died a little less than an hour later, at a hospital where he had been
taken, as a result of the gunshot wound to his chest....

(Doc. #6, Exh. 15 at 2).


## III.  APPLICABLE STANDARDS

Respondent acknowledges that Lawrence's habeas Petition is timely, that Lawrence has

fully exhausted his claims in the Ohio courts, and that his claims are fully preserved for a review

on the merits to determine if Lawrence is entitled to federal habeas relief.  *See* Doc. #6 at 10; *see*

*also Alley v. Bell*, 307 F.3d 380, 395-86 (6th Cir. 2002).

In 1867 Congress extended to the federal courts the power to grant a Writ of Habeas

Corpus when a person "is in custody in violation of the Constitution or laws or treaties of the

United States...."  28 U.S.C. §2241(c)(3); *see Williams v. Taylor*, 529 U.S. 362, 374 (2000).

In 1996 Congress enacted the AEDPA "dramatically alter[ing] the landscape for federal

habeas corpus petitions."  *Rhines v. Weber*, 544 U.S. 269, 274 (2005). The "AEDPA 'requires

heightened respect for state court factual and legal determinations.'"  *Fulcher v. Motley*, 444

F.3d 791, 824 (6th Cir. 2006)(citation omitted).

Under the AEDPA, a writ may not be granted unless the state court's
decision 'was contrary to, or involved an unreasonable application of, clearly
established' Supreme Court precedent or 'was based on an unreasonable
determination of facts in light of the evidence presented' during the state court
proceedings....  A state court decision is contrary to federal law when it 'arrives at

3

> a conclusion opposite to that reached by [the Supreme] Court on a question of law' or 'decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts.'  A state court decision constitutes an unreasonable application of Supreme Court precedent when it 'identifies the correct governing legal principle from [Supreme Court] decisions but unreasonably applies that principle to the facts' of the case.

*White v. Mitchell*, 431 F.3d 517, 523 (6th Cir. 2005) (quoting in part *Williams,* 529 U.S. at 412-13)(other citations omitted); *see Arnett v. Jackson*, 393 F.3d 681, 685 (6th Cir. 2005).

Under the AEDPA, the phrase "clearly established federal law" "'refers to the holdings, as opposed to the dicta, of [the United States Supreme] Court's decisions as of the time of the relevant state-court decision.'"  *Carey v. Musladin*, __ U.S.__, __, 127 S.Ct. 649, 653 (2006) (quoting *Williams*, 529 U.S. at 412).

The AEDPA distinguishes an unreasonable application of clearly established federal law from an incorrect application of such law.  *Bell v. Cone*, 535 U.S. 685, 694 (2002); *see Arnett*, 393 F.3d at 685.  This distinction prevents courts from granting habeas relief based on a federal court's *de novo* review of the relevant state court decision.  *See Davis v. Straub*, 430 F.3d 281, 286 (6th Cir. 2005) ("Ultimately, [a] federal court may not overrule a state court for simply holding a view different from its own, when the precedent from [the Supreme] Court is, at best, ambiguous." (citation and punctuation omitted)); *see also Price v. Vincent*, 538 U.S. 634, 639 (2003)(AEDPA precludes *de novo* review of a state court's rejection of federal constitutional claims).  Consequently, a "state court's application of federal law is unreasonable and habeas relief may be granted if the 'state court decision is so clearly incorrect that it would not be debatable among reasonable jurists.'"  *Joshua v. DeWitt*, 341 F.3d 430, 436 (6th Cir. 2003)(citation omitted).

IV.     DISCUSSION

Lawrence's Federal Habeas Corpus Petition raises six Grounds for Relief, addressed below.

A.      Grounds One and Three:
        **Ineffective Assistance of Trial Counsel**

**1.**
**Lawrence's Claims**

In his First Ground for Relief, Lawrence contends that his trial counsel provided constitutionally ineffective assistance in three ways: (1) failing to request a jury instruction limiting the consideration of "other acts" evidence, including evidence about his prior unrelated conduct (arrests, criminal possession of drugs, possession of weapons, and possession of a bullet-proof vest); (2) not objecting to the trial court's failure to give a limiting instruction on "other acts" evidence; and (3) failing to object to the prosecution's improper comments on the "other acts" evidence.

In his Third Ground for Relief, Lawrence argues that his trial counsel provided constitutionally ineffective assistance by failing to cross examine Detective Martin on the key issue of what another witness – Taquita Young – had reported to police.

**2.**
***Strickland v. Washington* and the AEDPA**

*Strickland v. Washington,* 466 U.S. 668 (1984) mandates a two-part showing. First, the petitioner must show that trial counsel's performance was deficient – that is, he or she "made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id*. at 687. Second, the petitioner must show that counsel's deficient performance was prejudicial to the defense to the extent it rendered the guilty verdict unreliable.

*Id*. at 688; *see Broom v. Mitchell*, 441 F.3d 392, 408 (6th Cir. 2006).

Because the AEDPA precludes a *de novo* review of federal constitutional claims, *see Price*, 538 U.S. at 639, Lawrence carries a heavy burden of establishing this constitutional violation.  "The Supreme Court has made clear that post-AEDPA claims of ineffective assistance of counsel brought by habeas petitioners will succeed only in very limited circumstances....  For [a petitioner] to succeed..., he must do more than show that he would have satisfied *Strickland*'s test if his claim were being analyzed in the first instance, because under §2254(d)(1), it is not enough to convince a federal habeas court that, in its independent judgment, the state-court decision applied *Strickland* incorrectly.  Rather, he must show that the ... [state] Court of Appeals applied *Strickland* to the facts of his case in an objectively unreasonable manner." *Payne v. Bell*, 418 F.3d 644, 665 (6th Cir. 2005).

### 3.
### Analysis

The Ohio Court of Appeals accurately described the two-part analysis – performance and prejudice – required by *Strickland*, 466 U.S. at 687-88.  *See* Doc. #6, Exh. 15 at 3.  Its decision was thus not "contrary to" *Strickland*.  *See Arnett v. Jackson*, 393 F.3d at 685.  The remaining AEDPA issues therefore concern whether the Ohio Court of Appeals unreasonably applied *Strickland* to Lawrence's specific ineffective assistance of counsel claims.  *See Payne,* 481 F.3d at 665; *see also Hill v. Mitchell*, 400 F.3d 308, 323-24 (6th Cir. 2005).

For the following reasons, the Ohio Court of Appeals did not unreasonably apply *Strickland* to reject Lawrence's ineffective assistance of counsel claims.

**a.**
**Cross-Examination of Detective Martin – an Issue of "Performance"**

The Ohio Court of Appeals determined that Lawrence's second ineffective assistance of

counsel claim lacks merit because trial counsel did not err during his cross-examination of

Detective Martin. The Ohio Court of Appeals reasoned as follows:

> This assignment of error is based on the following portion of the cross-examination of Dayton Police detective Raymond Martin:

> Q.     When you talked to, uh…Taquita Young, did she tell you that she saw someone shoot Antonne Pollard?

> A.     That's what she said. Then she explained that she saw, who she believed to be Phillip Lawrence chasing Antonne Pollard and she could see his hand stretched out and heard the gun shots.

> From our review of the entire transcript of Taquita Young's testimony, as well as the question and answer from police detective Martin's cross-examination quoted above, it would have been clear to the jury that Taquita Young did not actually see Lawrence fire a gun, because Lawrence's outstretched arms were already around the corner of her house when she saw him running around the corner. This is consistent with detective Martin's testimony. **An experienced defense attorney would realize that any attempt, in further cross-examining Martin, to drive home the point that Young did not actually see Lawrence shooting the gun might be met with Martin's statement that this was a reasonable inference to draw from what Young did say. We conclude that Lawrence's trial counsel was not ineffective for having failed to belabor this point**. Even if Lawrence's counsel could be deemed to have been ineffective in this respect, we find it unlikely in the extreme that this would have affected the outcome of the trial.

(Doc. #6, Exh. 15)(emphasis added). This was not an objectively unreasonable application of

*Strickland*.

"'Because advocacy is an art and not a science…, [counsel's] strategic choices must be

respected' if they were 'made after thorough investigation of law and facts relevant to plausible

options.'… Such choices can vary greatly from attorney to attorney and from case to case, and

reviewing courts must scrutinize these choices with a great deal of deference.  Indeed, such strategic choices are virtually unchallengeable." *Higgins v. Renico*, 470 F.3d 624, 632 (6th Cir. 2006)(quoting in part *Strickland*, 466 U.S. at 681, 690).  *Strickland* thus mandates, "Judicial scrutiny of counsel's performance must be highly deferential."  466 U.S. at 689.  "[A] court must engage in the strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.  When trial counsel's acts or omissions constituted trial strategy, his or her performance was not constitutionally deficient....." *Id.*; *see Higgins*, 470 F.3d at 632.

The Ohio Court of Appeals did not unreasonably apply *Strickland*'s deficient-performance prong when it determined that trial counsel's decision not to cross-examine Detective Martin in areas about which Lawrence now complains was based on counsel's strategic decisions.  Trial counsel's decision not to cross-examine Detective Martin was sound strategy because it prevented Detective Martin from testifying that it was reasonable to infer from Taquita Young's statement that she saw Lawrence shoot Antonne Pollard.  This is the precise type of trial tactic entitled to deference not only because it was strategic in nature, *see Strickland*, 466 U.S. at 689, but also because it was a sound trial strategy.  On the latter point, Lawrence's trial counsel did not err by choosing the less risky option – not giving Detective Martin the opportunity to present identification testimony highly favorable to the prosecution's case and highly harmful to Lawrence's case.

8

**b.**
**Other Acts Evidence – an Issue of "Prejudice"**

The Ohio Court of Appeals rejected Lawrence's first ineffective assistance of counsel claim based on the conclusion that no prejudice resulted from trial counsel's failure to request a limiting jury instruction on evidence related to other acts, explaining as follows:

> The State did not present evidence in any detail concerning the charge resulting in Lawrence's arrest. Lawrence used the fact that he had been arrested for an unrelated charge, several months after having been identified by a witness as the perpetrator of this murder, in his closing argument. He argued to the jury that the police obviously must have found his identification to be lacking in credibility, and only decided to charge him with the Murder after he had been arrested for an unrelated offense several months later.

> The State brought out the presence of the gun, a bullet-proof vest, illegal drugs, and scales for weighing the drugs, in its cross-examination of Latasha Wade, the woman with whom Lawrence was living, and the mother of his child. Wade had painted a picture of Lawrence as a loving father, who was not only actively involved in the rearing of his own child, but also in the rearing of her two children. The State, in its cross-examination of Wade, presented a contrasting picture of their home as a home where illegal drugs were kept for sale, along with a gun and a bullet-proof vest. However, no direct proof was offered of Lawrence having committed an act of drug trafficking.

> In assessing whether there is a reasonable probability that the outcome of this trial would have been otherwise, had a limiting instruction been given, we must take into consideration the overall strength of the evidence against Lawrence....[2] We would characterize the evidence as neither overwhelming ... nor particularly weak. It included a witness who positively identified Lawrence as the person seen running, arms stretched out in front of him, consistent with holding a gun (although the gun was not seen), between the first and second bursts of gun fire. This witness also identified him as the person seen walking toward her, shortly after, gun in hand, and looking at her with a 'look to kill.' This evidence corroborated with the decedent's dying declaration that 'P.J.' was the person who shot him. We recognize that the defense established at trial that there were two other persons with connections to this error who also went by the nickname 'P.J.'

---

[2]  The Ohio Court of Appeals correctly indicated here that it discussed the evidence against Lawrence in a different section of its opinions.

9

> All in all, we construe the evidence in this case to be intermediate between an overwhelming evidence case and a close case.  Although we recognize the danger that a jury may draw the forbidden inference – that is, that because the defendant performed a reprehensible act on one occasion, he must have committed the act for which he is being tried – we are loath to assume that a jury would give that inference much weight in view of the instructions given the jury concerning the presumption of innocence and the burden of proof beyond a reasonable doubt.  In any case other than a close case, where we can easily envision a jury reaching a verdict of not guilty, we are not prepared to find that trial counsel's failure to have requested a limiting instruction concerning evidence of other bad acts creates a reasonable probability of a different outcome, at least where the other bad acts are not markedly similar to the charged offense, a prior sex offense in a sex-offense case, for example.

(Doc. #6, Exh. 15 at 3)(footnoted added).

Lawrence has not demonstrated that the Ohio Court of Appeals' rejection of this ineffective assistance of counsel claim involved an unreasonable application of *Strickland*'s demanding prejudice standard.  *Strickland* explains that the occurrence of a performance error by trial counsel, "even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment."  *Id*. at 691.  "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional error, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Id*. at 694; *see Bugh*, 329 F.3d at 515.  In light of this demanding "prejudice" standard, even if Lawrence's trial counsel committed error by not requesting a limiting instruction concerning "other act" evidence, the Ohio Court of Appeals' rejection of this claim was not an unreasonable application of *Strickland*'s prejudice standard.  The Ohio Court of Appeals' characterization of the evidence against Lawrence as "intermediate between an overwhelming case and a close case" is supported by the trial record and by the Ohio Court of Appeals' lengthy, detailed weighing of the evidence against Lawrence

when rejecting his challenge to the manifest weight of the evidence, *see id*. at 3-8.  At most, Lawrence's contrary arguments demonstrate that room for disagreement might exist regarding where on the Ohio Court of Appeals' spectrum – close case? intermediate case? overwhelming case? – the evidence against Lawrence fell.  Under the AEDPA, federal habeas relief is not available based on a possible disagreement with this aspect of the Ohio Court of Appeals' decision.  Instead, this Court must ask whether the Ohio Court of Appeals unreasonably applied *Strickland*'s prejudice standard through its finding of an intermediate case against Lawrence.

Regardless of how the case against Lawrence should be characterized, the Ohio Court of Appeals' decision reveals the presence of a sufficient quantity and quality of evidence to overcome the absence of a limiting jury instruction on "other act" evidence.  *See* Doc. #6, Exh. 15 at 3-8.  The Ohio Court of Appeals further recognized that the trial court properly instructed the jury regarding the presumption of innocence and the correct burden of proof – beyond a reasonable doubt – further supports the reasonableness of its decision.  Given the evidence against Lawrence and the jury instructions regarding the presumption of innocence and burden of proof, the absence of a limiting jury instruction on "other acts" evidence did not nullify the adversarial process of trial or otherwise undermine confidence in Lawrence's guilt.  Because the adversarial process remained intact, no prejudice resulted from the omission of a limiting jury instruction concerning "other act" evidence.  *See Strickland*, 466 U.S. at 694 ("The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence the outcome."); *see also Bugh*, 329 F.3d at 515.

Accordingly, the Ohio Court of Appeals' rejection of this ineffective assistance of

11

counsel claim was not based on an unreasonable application of *Strickland*'s standards.

### B.      Ground Two:  Manifest Weight of the Evidence

Lawrence asserts in his second Ground for Relief,  "Petitioner was denied due process of law where his convictions are against the manifest weight of the evidence....  The state did not prove, as required, each and every element.  The evidence produced by the state was unreliable and vague, uncertain and in conflict with other evidence."  (Doc. #1 at 10).

Respondent contends that this assignment of error is not cognizable in a federal habeas review because the Due Process Clause of the Fourteenth Amendment to the United States Constitution does not provide relief for state defendants whose convictions are against the manifest weight of the evidence.  Lawrence's Reply does not specifically address this contention.  *See* Doc. #8 at 4-17.

Although Lawrence frames this claim as a denial of "due process of law," (Doc. #1 at 10), his only supporting contention is that the verdict was against the manifest weight of the evidence.  *See id.*  There is, however, a distinction between a claim asserting that a criminal conviction is against the manifest weight of the evidence and a claim under the Due Process Clause of the Fourteenth Amendment.  Under Ohio law, a broader test applies to manifest-evidence claims than the test applicable under federal law to the sufficiency of the evidence.  *See State v. Thompkins*, 78 Ohio St.3d 380, 387-88 (1997), *superceded in part by state constitutional amendment*, *State v. Smith*, 80 Ohio St.3d 89 (1997); *see also State v. Martin*, 20 Ohio App.3d 172 (1983); *State v. Thompson*, 127 Ohio App.3d 511 (1998); *cf. Tibbs v. Florida*, 457 U.S. 31,

12

42-43 (1982).[3]  The distinction was thoroughly discussed in *Echols v. Houck*, 2005 WL 1745475

at *3 (S.D. Ohio, July 25, 2005) as follows:

> In essence, sufficiency, which implicates due process concerns, tests the adequacy of the evidence in proving the essential elements of the offense charged and presents a question of law, which may not be resolved by the reviewing court through weighing the evidence.  In contrast, in determining whether reversal is warranted based on the weight of the evidence, the appellate court sits as a 'thirteenth juror' to assess the jury's resolution of conflicting testimony upon review of the entire record, which includes weighing the evidence and all reasonable inferences and considering the credibility of witnesses.  *Thompkins*, 678 N.E.2d at 546-47; *see also Tibbs*, 457 U.S. at 41-42; *Martin*, 485 N.E.2d 720-21.

> As the Supreme Court explained in *Tibbs*, 457 U.S. at 43, unlike a reversal on the ground of insufficient evidence, a reversal based on the weight of the evidence 'does not mean that acquittal was the only proper verdict.'  Rather, a reversal based on the weight of the evidence 'can occur only after the State both has presented sufficient evidence to support a conviction and has persuaded the jury to convict.  The reversal simply affords the defendant a second opportunity to seek a favorable judgment.  *Id*. at 42-43.

> A federal court may review a state prisoner's habeas corpus petition only on the ground that the challenged confinement violates the Constitution, law, or treaties of the United States, 28 U.S.C. §2254(a).  A federal court may not issue a writ of habeas corpus 'on the basis of a perceived error of state law.'  *Pulley v. Harris*, 465 U.S. 37, 41 ... (1984); *Smith v. Sowders*, 848 F.2d 735, 738 (6th Cir.), *cert. denied*, 488 U.S. 866 ... (1988).

This discussion led the District Court in *Echols* to dismiss the petitioner's claim that his

conviction was against the manifest weight of the evidence as not implicating a federal

constitutional concern but instead as only raising an issue of state law that was not cognizable

upon federal habeas review.  *Id*.

The same reasoning and result apply to Lawrence's claim that his convictions were

---

[3]  For an example of the many recent unpublished Ohio cases recognizing this distinction see *State v. Braxton*, 2006 WL 1644268 at *2-*3 (Ohio Ct. App., June 15, 2006).

against the manifest weight of the evidence. *See id.* (and cases cited therein). Although Lawrence mentions "due process of law" (Doc. #1 at 10), he bases this claim only on the assertion that his convictions were against the manifest weight of the evidence. Lawrence does not assert that his convictions fail because of the absence of constitutionally sufficient evidence, and he does not refer to applicable federal case law or to the federal standards applicable to such claims raised under the Due Process Clause of the Fourteenth Amendment. *See Jackson v. Virginia*, 443 U.S. 307 (1979). His Second Ground for Relief thus presents only a non-cognizable claim.[4] *See* 28 U.S.C. §2254(d) (habeas relief available only if conviction was "contrary to, or involved an unreasonable application of, clearly established <u>Federal law</u>...."(emphasis added)); *see also Pulley*, 465 U.S. at 41.

Accordingly, Lawrence's Second Ground for Relief fails to raise a claim cognizable on federal habeas review.

### C. Ground Four: Prosecutorial <u>Misconduct and Ineffective Assistance of Trial Counsel</u>

#### 1.
#### Lawrence's Claims and the
#### <u>Ohio Court of Appeals' Decision</u>

Lawrence contends in his Fourth Ground for Relief, "The totality of the circumstances reveal that the prosecutor's misconduct was flagrant and deliberate ... [w]ith the intention to mislead the jury in a case where the proof of guilt <u>is</u> <u>not</u> overwhelming...." (Doc. #8 at 11) (emphasis in original). Lawrence maintains that the prosecutor's misconduct, along with his trial

---

[4] This conclusion is consistent with how Lawrence raised this claim – as a state rather than a federal claim – in the Ohio Court of Appeals and the Ohio Supreme Court. *See* Doc. #6, Exhs. 11, 16. The Ohio Court of Appeals, moreover, reviewed this claim under Ohio law. *See* Doc. #6, Exh. 15 at 3-8.

counsel's ineffectiveness in failing to object to this misconduct, violated his right to a fair trial.

Respondent contends that the prosecutor committed no misconduct, that the alleged incidents of misconduct did not deprive Lawrence of a fair trial or due process of law, and consequently, Lawrence's trial counsel was not ineffective for failing to object to the prosecutor's misconduct.

**2.**
**Applicable Standards**

"In order to prevail on a claim of prosecutorial misconduct, a habeas petitioner must demonstrate that the statements of the prosecutor 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Simpson v. Jones*, 238 F.3d 399, 409 (6th Cir. 2000) (quoting in part *Donnelly v. DeChristoforo,* 416 U.S. 637, 643, ... (1974)). "In order to deny due process, the misconduct must be 'so pronounced and persistent that it permeates the entire atmosphere of the trial' or 'so gross as probably to prejudice the defendant.' " *Simpson*, 238 F.3d at 409 (quoting in part *Pritchett v. Pitcher,* 117 F.3d 959, 964 (6th Cir. 1997)).

To determine whether prosecutorial misconduct violated a defendant's right to a fundamentally fair trial, a two-part inquiry applies. *Macias v. Makowski*, 291 F.3d 447, 452 (6th Cir. 2002). First, the Court considers whether the prosecutor's conduct and remarks were improper. *Id*. If improper conduct or remarks occurred, then the Court examines the following four factors to determine whether the impropriety was "flagrant" and thus violated the defendant's due process rights. *Id*.

    1.     Whether the conduct and remarks of the prosecutor tended to mislead the jury or prejudice the defendant;

    2.     Whether the conduct or remarks were isolated or extensive;

15

3.      Whether the remarks were deliberately or accidentally made; and

4.      Whether the evidence against the defendant was strong.

*Macias*, 291 F.3d at 452.

### 3.
### "Identity is not a[n] Issue"

During the prosecutor's closing arguments, she described the identity issue – *i.e.*, who

killed Antonne Pollard – in part as follows:

> It is also uncontroverted, that I submit to you, that the person who killed Antonne Pollard, is the Defendant.
>
> * * *
>
> Now, the only question that has really been raised is who did it?  Uh ... what evidence do we have to establish that the Defendant committed this crime? And I submit to you that identity is not a[n] issue in this case.  And it's not an issue in this case for two reasons.
>
> You heard the testimony of Taquita Young, who told you when she woke up that morning, she was getting her kids ready for school.  She opened her back door and she saw the Defendant runnin' around the corner.  Now, she could not see what was in his hands, but she saw his arms outstretched.
>
> At the same time, she heard shots.  And a few ... moments later, she heard, uh ... Antonne Pollard at her door screamin' for help.  She heard additional shots. Moments later, we know that Antonne Pollard is found shot.  That he's been shot through the chest and he was shot in the hand.  We also know that Taquita Young saw the Defendant moments after that, and when she saw him he had a gun in his hand.  And that he gave her a look to kill, a look that said, 'you say anything and you're next.'  That's circumstantial evidence that he was the person that shot Antonne Pollard.
>
> Well, we ... not only have that in this case.  We have Antonne Pollard, who, as he is lying there bleeding to death, tells anybody and everybody who was listenin' who shot him.  P.J. shot him.  He tells Chris Lacy when he comes to that apartment that P.J. shot him.  He tells Taquita Young when she comes to that apartment that P.J. shot him.  He tells the officers when they come to that apartment that P.J. shot him.
>
> Is it a mere coincidence that the same person he say[s] shot him is the

16

same person that Taquita Young saw with a firearm when she heard the shots? That she saw him runnin′ after Antonne Pollard? Is that a mere coincidence that′s the same person that he says shot him? Ladies and gentleman, identity is not an issue in this case.

(Doc. #6, Exh. 15 at 9-10).

The Ohio Court of Appeals determined that the prosecutor "improperly stated that identity was not an issue in the case." *Id*. at 10. However, the Ohio Court of Appeals concluded, "we are convinced that it was clear to the jury that the identity of the perpetrator was the crucial issue in the case." *Id*. The Ohio Court of Appeals further explained, "In the entire context of the prosecutor's argument, there is no reasonable probability that the jury could have been misled into believing that identity was not an issue. Accordingly, the prosecutor's misstatement does not constitute plain error, and defense counsel's failure to have objected to it does not constitute ineffective assistance of counsel." *Id*.

The Ohio Court of Appeals' decision was neither contrary to United States Supreme Court precedent nor based on an unreasonable application of the standards applicable to claims of prosecutorial misconduct. The prosecutor began this part of closing argument by stating the issue correctly. She explained to jury, "Now, the **only question** that has really been raised is who did it? Uh ... what **evidence** do we have to establish that **the Defendant committed** this crime?" (Doc. #6, Exh. 15 at 9)(emphasis added). These statements plainly and correctly framed the identity issue for the jury. The bulk of the prosecutor's remaining arguments about the identity issue addressed what evidence supported the conclusion the Defendant committed this crime. Although this also led the prosecutor to argue that identity was not an issue, when read in context, the prosecutor was simply arguing that the evidence led to one conclusion – Defendant committed the crime – rather than presenting a statement of law or an instruction that

17

mandated the jury not to consider the issue of whether Defendant committed the crime. Consequently, when read in context, as the Ohio Court of Appeals did, the prosecutor's "identity not an issue" statements did not mislead the jury and did not constitute pronounced and persistent misconduct that permeated the entire atmosphere of Lawrence's trial. These statements were not "so gross" as to probably prejudice Lawrence. *See Simpson*, 238 F.3d at 409.

Further support for this conclusion appears throughout the trial judge's jury instructions, which correctly explained the need for the prosecution to prove beyond a reasonable doubt that Lawrence was the person who killed Antonne Pollard.  The trial judge did so by correctly instructing the jury about the presumption of Lawrence's innocence as well as the prosecution's burden to prove beyond a reasonable doubt all the elements of murder (and the other charged criminal offenses).  Specifically, the trial judge instructed, in part, "Before you can find the Defendant Guilty of Murder, you must find beyond a reasonable doubt that on or about the 24th day of October, in the year 2000, and in Montgomery County, Ohio, the Defendant purposely caused the death of one Antonne Pollard."  (Tr. 510).  This, and other similar jury instructions, informed the jury of its duty to resolve the identity issue when determining whether the prosecution had met its burden of proving Lawrence murdered Antonne Pollard.

In addition, the trial judge emphasized the jury's duty to resolve the identity issue when discussing Lawrence's assertion of an alibi.  The trial judge did so by instructing, "If after a consideration of the evidence, of alibi along with all the evidence, you are not convinced beyond a reasonable doubt that the Defendant was present at the time in question, you must return a Verdict of Not Guilty."  (Tr. 516-17).  Given these specific jury instructions, and the jury instructions as a whole, the jury could not have been misled by the prosecution's "identity not an

18

issue" arguments and Lawrence thus suffered no prejudice due to these arguments.

### 4.
### Remaining Claims of Misconduct

Lawrence contends that the prosecutor engaged in misconduct by improper impeachment of witness Latasha Wade, with whom Lawrence was living at the time of the shooting. Lawrence points to the prosecutor's questions to Wade about her knowledge of a gun found by police during Lawrence's prior arrest on unrelated charges. These questions, according to Lawrence, constituted an improper invitation to the jury to convict Lawrence on the basis of his lifestyle and unrelated criminal activity.

The Ohio Court of Appeals found no misconduct in the prosecutor's questions to Wade or closing arguments about Wade's credibility. The Ohio Court of Appeals recognized that the prosecutor was attempting to impeach Wade's credibility by showing that she knew the gun was under the mattress, in direct contrast to her prior testimony. The Court of Appeals explained as follows:

> Lawrence seems to be contending that the State's cross-examination and argument concerning the presence of a gun under the mattress is unfair because it never established how long the weapon had been there. The State never claimed that the gun had been there any particular length of time. In our view, it is a reasonable inference that the gun had been there for some period of time, in the absence of any testimony indicating that the gun had only been put there for a particular purpose shortly before it was discovered. We conclude, therefore, that this line of questioning and argument was not improper.

(Doc. #6, Exh. 15 at 8).

Respondent correctly contends that this line of questioning and argument concerning Wade's credibility was proper because Lawrence had placed his good character at issue by eliciting certain testimony from Wade – that Lawrence had helped create a safe and healthy

19

home for their children.  In light of this testimony, it was not misconduct for the prosecutor to

impeach Wade's credibility by questions about her knowledge of Lawrence's prior bad acts,

whether or not she knew about the hand gun hidden under their mattress.  These questions

advanced the prosecutor's proper argument to the jury – that if Lawrence had secreted a gun

under the mattress, his character was not as good as he wanted the jury to believe.

Consequently, this questioning and related arguments did not deprive Lawrence of a

fundamentally fair trial.

Lawrence next argues that the prosecutor engaged in a wrongful attack on defense

counsel during the following closing arguments:

> You all were out to Dayton Metropolitan Housing in the view that we took
> Monday, whenever it was.  I have to disagree with Mr. Nystrom [Lawrence's trial
> counsel].  Dayton Metropolitan Housing is a system designed to give a good
> lifestyle to the residents, to the people in that community.  There may be people
> there that he does not like.  And he wants to categorize all people that live in that
> project area because of the lifestyle of somebody, and that therefore we cannot
> dispense justice for what happens in there.
>
> He talked about the character of Mr. Antonne Pollard, whom I've gotten
> to know as calling him Tonne.  Had some – I'm going to say, he probably had
> some crack in his pockets.  But that does not subtract from the importance of his
> life, to us or his family.  And this lawyer should not try to subtract from that
> because of the habit that Tonne had.

(Doc. #6, Exh. 15 at 10).  The Ohio Court of Appeals found no misconduct in these arguments

because the prosecutor was responding to certain closing arguments by Lawrence's counsel

suggesting that Antonne Pollard's life had diminished value.[5]  *See id.*  Lawrence has not shown

---

[5] Specifically Lawrence's counsel previously argued:

> But what we have heard about this community out here, a project?  Ms. Burdette was
> talkin' about the list of people that she has on her trespass list running into the hundreds.  Almost
> every witness that who have heard said that shooting goes on nearly every other - every night,
> every other night.  Tremendous amounts of gun activity, tremendous amounts of gun activity in

that such comments were improper because – as the Ohio Court of Appeals correctly recognized – it was proper for the prosecutor to attempt to rebut the suggestion by Lawrence's counsel that the victim's life had diminished value.  *See Darden v. Wainwright*, 477 U.S. 168, 179 (1986) ("The prosecutor's comments must be evaluated in light of the defense argument that preceded it...."). As a result, these closing arguments involved no prosecutorial misconduct and did not deny Lawrence a fundamentally fair trial.

Lawrence lastly contends that the prosecutor improperly bolstered witness Taquita Young's credibility by stating that she deserves to be placed on a pedestal.

The Ohio Court of Appeals held that the prosecutor did not improperly bolster Young's credibility, explaining in part:

> The two crucial witnesses in this case were Taquita Young and Latasha Wade.  Young's testimony was essential to establishing Lawrence's identity as the person who shot Pollard.  Wade provided alibi testimony that, if believed, would preclude Lawrence being the perpetrator.  Obviously, then, the jury was going to have to weigh the credibility of the witnesses.

(Doc. #6, Exh. 15 at 11-12).  The Ohio Court of Appeals then reviewed extended portions of the prosecutor's closing arguments, and concluded, " In our view, the prosecutor made a reasonable argument that Young's testimony was worthy of belief."  *Id*. at 12.

---

this community.  And obviously, Antonne Pollard died.

Antonne Pollard was in the middle of that.  He had alcohol, marijuana, cocaine in his system when he died. There were not zero.  He had been prohibited from being on the site.  He was on the site.  But that is not enough to go and point the finger at Philip Lawrence.  You've got to know that Philip Lawrence was the person.

We also know that ... Mr. Pollard had a history of offenses.  And every other year almost he was picking up a new one.  So he'd been living in this environment for a long time.  How many people had he crossed ... during that time, I don't know.  How many people had a problem with him during that time, I don't know.

(Doc. #6, Exh. 15 at 10).

"It is well-established law that 'a prosecutor cannot express his personal opinions before the jury.' *United States v. Galloway,* 316 F.3d 624, 632-33 (6th Cir. 2003). '[I]t is improper for a prosecuting attorney in a criminal case to state his personal opinion concerning the credibility of witnesses or the guilt of a defendant.'" *Bates v. Bell*, 402 F.3d 635, 644 (6th Cir. 2005).

A review of the prosecutor's closing arguments does not reveal any misconduct because the prosecutor did not improperly attempt to support Young's testimony with her own personal opinion that she was credible. *See* Doc. #6, Exh. 6 at 11-12. The closest vouching statement made by the prosecutor was assertions that Young deserved to be "placed on the pedestal." *Id.* at 11. When read in context, these arguments did not constitute improper vouching. The prosecutor did not specifically place her personal imprimatur on Young by, for example, using the phrase "I think" or "I believe." *See id.* at 11-12. She instead presented argument by repeatedly arguing, "I submit...," and by supporting her use of this phrase with non-personalized arguments about the evidence. *Id.* Consequently, these arguments did not constitute improper vouching for Young's credibility and did not deprive Lawrence of a fundamentally fair trial. *See Joseph v. Coyle*, 469 F.3d 441, 474 (6th Cir. 2006) (prosecutor's improper vouching by repeatedly prefacing statements with "I believe" or "I think," when examined in context, did not rise to the level of a due-process violation).

Accordingly, because none of the prosecutorial conduct challenged by Lawrence violated his right to a fundamentally fair trial, his claims of ineffective assistance of trial counsel based on counsel's failure to object to the instances of alleged prosecutorial misconduct, likewise lack merit.

**5.**
**Ineffective Assistance of Counsel**

The Ohio Court of Appeals finding that Lawrence's trial counsel was not ineffective for failing to object to any of the instances of alleged prosecutorial misconduct was not an unreasonable application of law. The Court made its decision after finding that there was only one instance of prosecutorial misconduct, that it was clear from the rest of the prosecutor's argument that the prosecutor did not really mean what was said, and that it was improbable the jury was misled by the statement. Thus, it was not unreasonable for the court to find the attorney not ineffective for failing to object to the instances of alleged misconduct when the court found that there was no reason for the attorney to object. Further, it was reasonable for the court to find that, because the statement made by the prosecutor was taken in context of the entire argument, Lawrence's attorney was not ineffective for not objecting to it; since, it had no prejudicial effect to Lawrence's trial.

Therefore, Lawrence's Fifth Ground for Relief should be denied, because he was not denied due process.

**D.**     **Grounds Five and Six: Evidentiary/Fair Trial Claims**

**1.**
**The Parties' Contentions**

Lawrence contends in his Fifth Ground for Relief that the trial court erred by overruling his attorney's objections to the prosecution's repeated leading questions. *Id*. Lawrence emphasizes, "[the] prosecution in this case actually put words into the mouth of witnesses, thereby denying Petitioner a fair trial." (Doc. #1 at 13).

Lawrence maintains in his Sixth Ground for Relief that he was denied a fair trial due to

23

the trial court's improper admission into evidence of two related items: a handgun and a photograph of the handgun. Lawrence reasons that the admission of this evidence denied him a fair trial, because it was undisputed that the handgun was not used in the criminal offense at issue. Lawrence explains that the gun was confiscated by police in an unrelated investigation of him and that its admission into evidence (together with the photograph) was highly prejudicial since the evidence of his guilt was weak.

Respondent argues that these claims only raise non-cognizable state law claims, and that the Ohio Court of Appeals "considered and rejected Lawrence's leading-question claim on state-law grounds and determined that it did not give rise to a federal due process claim." (Doc. #6 at 39). As to Lawrence's claim concerning the gun and photograph, Respondent explains that the Ohio Court of Appeals "considered and rejected this claim on state law grounds and because it does not rise to the level of a due process violation...." *Id*. at 41.

## 2.
## Applicable Law and Analysis

"'[E]rrors in application of state law, especially with regard to the admissibility of evidence, are usually not cognizable in federal habeas corpus.'" *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003)(quoting *Walker v. Engle*, 703 F.2d 959, 962 (6th Cir. 1983) (other citations omitted). To the extent, then, that Lawrence's Fifth and Sixth Grounds for Relief are based only on claimed violations of Ohio law, they are not cognizable in this case. *See Bugh*, 329 F.3d at 512 (and cases cited therein).

In general, contentions regarding the erroneous and prejudicial admission of evidence during a state criminal trials can, in rare cases, rise to the level of a federal constitutional violation. *See Bugh*, 329 F.3d at 512.

> When an evidentiary ruling is so egregious that it results in a denial of
> fundamental fairness, it may violate due process and thus warrant habeas relief....
> Nonetheless, courts have defined the category of infractions that violate
> fundamental fairness very narrowly.... Generally, state-court evidentiary rulings
> cannot rise to the level of due process violations unless they offend some
> principle of justice so rooted in the traditions and conscience of our people as to
> be ranked as fundamental.

*Bugh*, 329 F.3d at 512 (citations and internal punctuation omitted); *see Burton v. Renico*, 391

F.3d 764, 774 (6th Cir. 2004).

Lawrence has not shown that the claimed evidentiary errors were so egregious that they

resulted in an unreliable verdict or otherwise caused the denial of a fundamentally fair trial.

Instead, his claims are analogous to the evidentiary/due process claims at issue in *Bugh v.

Mitchell*, 329 F.3d 496, 512-13 (6th Cir. 2003). Like Lawrence, the petitioner in *Bugh* argued

that the admission of certain evidence "served only to demonstrate that Bugh was a 'bad man,'

and was so prejudicial that 'it poisoned the trial and violated [his] right to a fundamentally fair

trial." 329 F.3d at 512. In rejecting these arguments, the United States Court of Appeals for the

Sixth Circuit explained, in part, "In this case, the admission of prior bad acts evidence was not

contrary to clearly established Supreme Court precedent. There is no clearly established

Supreme Court precedent which holds that a state violates due process by permitting propensity

evidence in the form of other bad acts evidence...." *Id*. Similarly, Lawrence does not point to

any Supreme Court case – particularly any case decided after *Bugh* – finding a due process

violation by the admission of evidence concerning prior bad acts during a state criminal trial.

*See* Doc. #1 at 13-14; *see also* Doc. #8 at 15-17. *Bugh* therefore controls Lawrence's Sixth

claim, and consequently, the trial court's decision to admit the handgun and photograph into

evidence, and the Ohio Court of Appeals' rejection of Lawrence's challenges to this evidence,

were not "contrary to" United States Supreme Court precedent.  *See Bugh*, 329 F.3d at 512-13.

Similarly, Lawrence has not shown that his Fifth claim – challenging certain leading

questions propounded by the prosecution – resulted in an unreliable verdict or otherwise denied

him a fundamentally fair trial.  The Ohio Court of Appeals correctly determined that many of the

challenged questions did not constitute leading questions.  *See* Doc. #6, Exh. 15 at 13-14.  These

non-leading questions, therefore, did not amount to errors at all, let alone the type of egregious

error that may lead to a denial of due process.  *See Bugh*, 329 F.3d at 512 (evidentiary error must

be so egregious as to deny a fundamentally fair trial).  Although the Ohio Court of Appeals

identified one series of questions as improper leading by the prosecution, *id*. at 12-13, the Court

of Appeals reasoned and held, "the subject matter of this questioning, which went to the reasons

why [the witness] had not testified at a prior hearing, is so peripheral to the issues in this case,

that we conclude that the trial court's error in having overruled Lawrence's objection to the

leading question is harmless."  *Id*. at 13.  Lawrence has not pointed to a United States Supreme

Court case holding that the erroneous admission of answers to leading questions was so

egregious as to undermine the reliability of the guilty verdict or otherwise deny the defendant a

fundamentally fair trial.  *See* Doc. #1 at 13; Doc. #8 at 13-14.  His contention that the

prosecution was putting words into the mouths of witnesses merely restates the reason leading

questions are often not permitted, and does not establish that the claimed leading-question errors

were so egregious as to undermine the reliability of the verdict.  *See* Doc. #1 at 13; *see also* Doc.

#8 at 13-14.  In addition, to accept Lawrence's leading-question arguments would require a *de*

*novo* review and rejection of both the state-law evidentiary rulings at trial and by the Ohio Court

of Appeals as well as the Ohio Court of Appeals' harmless error ruling.  Without contrary

Supreme Court caselaw – which is wholly lacking from Lawrence's arguments – the AEDPA prohibits this type of *de novo* review of these rulings. *See Price*, 538 U.S. at 641 ("[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the state-court decision applied [a Supreme Court case] incorrectly.").

Accordingly, Lawrence's Fifth and Sixth Grounds for Relief raise non-cognizable state law claims and otherwise fail to show that he is entitled to federal habeas relief.

## V.        CERTIFICATE OF APPEALABILITY

Before a petitioner may take an appeal from a denial of a petition for a writ of habeas corpus, he or she must first obtain a certificate of appealability. 28 U.S.C. §2253(c)(1)(A). To obtain a certificate of appealability when a petition is denied on the merits, the petitioner must make a substantial showing of the denial of a constitutional right. *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). This is accomplished by showing that reasonable jurists could debate whether the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further. *Slack*, 529 U.S. at 484 (quoting *Barefoot v. Estelle,* 463 U.S. 880, 893 (1983)).

If the District Court dismisses the petition on procedural grounds without reaching the constitutional questions, the petitioner must show that jurists of reason would find it debatable whether the District Court is correct in its procedural ruling. *Slack*, 529 U.S. at 484. The procedural issue should be decided first so as to avoid unnecessary constitutional rulings. *Slack*, 529 U.S. at 485 (citing *Ashwander v. TVA*, 297 U.S. 288, 347, 56 S. Ct. 466, 80 L. Ed. 688 (1936)(Brandeis, J., concurring)).

For the reasons set forth throughout this report, the conclusions that each of Lawrence's

27

grounds for relief lack merit are not debatable by jurists of reason, and consequently, a certificate

of appealability should not issue.

## IT IS THEREFORE RECOMMENDED THAT:

1.      Phillip H. Lawrence's Petition for Writ of Habeas Corpus (Doc. #1) be DENIED
         and DISMISSED;

2.       A certificate of appealability under 28 U.S.C. §2253(c) not issue; and

3.      The case be terminated on the docket of this Court.


May 10, 2007                                               _____s/ Sharon L. Ovington_____
                                                                     Sharon L. Ovington
                                                              United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within ten days after being served with this Report and Recommendations.  Pursuant to Fed. R. Civ. P. 6(e), this period is extended to thirteen days (excluding intervening Saturdays, Sundays, and legal holidays) because this Report is being served by mail.  Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections.  If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs.  A party may respond to another party's objections within ten days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See United States v. Walters*, 638 F. 2d 947 (6th Cir. 1981); *Thomas v. Arn,* 474 U.S. 140 (1985).